# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TUAN THANH PHAN,
U.S. Naval Base, Djibouti

ENRIQUE ARIAS-HIERRO,
U.S. Naval Base, Djibouti

JOSE MANUEL RODRIGUEZ-QUINONES,
U.S. Naval Base, Djibouti

THONGXAY NILAKOUT,
U.S. Naval Base, Djibouti

JESUS MUNOZ-GUTIERREZ,
U.S. Naval Base, Djibouti

KYAW MYA,
U.S. Naval Base, Djibouti

DIAN PETER DOMACH, and
U.S. Naval Base, Djibouti

NYO MYINT,
U.S. Naval Base, Djibouti

*Petitioners-Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
245 Murray Lane, SW
Washington, DC 20528;

KRISTI NOEM, Secretary of the U.S. Department
of Homeland Security, in her official capacity,
245 Murray Lane, SW
Washington, DC 20528;

TODD LYONS, Acting Director and Senior Official
Performing the Duties of the Director of U.S.
Immigration and Customs Enforcement, in his official
capacity,
500 12th Street, SW Washington,
DC 20536;

Case No. 25-2147

**COMPLAINT AND PETITION FOR WRIT OF HABEAS CORPUS**

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street, SW Washington,
DC 20536;

PETE HEGSETH, Secretary of Defense, in his
official capacity,
1000 Defense Pentagon
Washington, DC 20301;

U.S. DEPARTMENT OF
DEFENSE,
1000 Defense Pentagon
Washington, DC 20301;

MARCO RUBIO, Secretary of State, in his official
capacity
2201 C Street, NW Washington,
DC 20520; and

U.S. STATE DEPARTMENT
2201 C Street, NW Washington,
DC 20520;

*Respondents-Defendants.*

## INTRODUCTION

1.     Petitioners-Plaintiffs ("Plaintiffs"), detained in a converted shipping container at a

U.S. naval base in Djibouti in custody of Defendants, are at imminent risk of removal to South

Sudan—one of the most notoriously dangerous countries in the world, where Plaintiffs may be

indefinitely imprisoned, persecuted, tortured, or killed.

2.     Punishing Plaintiffs is the point. Defendants have openly broadcast that their

motivation for selecting far-flung, rights abusing countries like South Sudan to accept deportees,

an unprecedented departure from practice and policy, is to penalize noncitizens like Plaintiffs and

deter migration.

3.     South Sudan is embroiled in a violent civil war. The U.S. Statement Department

2

website warns Americans *not* to travel to South Sudan and, if they do, first to make funeral arrangements, write their will, and appoint a family member to be a hostage-taker negotiator.[1] As foreign deportees, who have been widely maligned as "barbaric monsters" by Defendants, Plaintiffs face grave danger there, including likely confinement.

4.      Plaintiffs are from Cuba, Laos, Mexico, Burma, Sudan and Vietnam—not South Sudan. But Defendants did not attempt to effectuate their removal to those countries, even though some countries, such as Mexico, routinely accept repatriation of its own citizens. Defendants chose instead to punish Plaintiffs with removal to an arbitrary third country, a country where Plaintiffs are likely to face harm.

5.      At no point during Plaintiffs' removal proceedings was South Sudan designated as a country for removal. At no point were Plaintiffs afforded notice and an opportunity to be heard that they fear for their lives if removed there. These are basic due process protections mandated by U.S. and international law, deliberately flouted by Defendants.

6.      In *D.V.D. v. DHS* ("*D.V.D.*"), the district court enjoined Defendants' practice of forcibly removing noncitizens to countries where they may be harmed without minimum due process protections—notice and an opportunity to be heard. No. 1:25-cv-10676-BEM, ECF No. 64 (D. Mass). While the injunction is now stayed by the Supreme Court in full, *see DHS v. D.V.D.*, 606 U.S. ___, No. 24A1153 (U.S. Jul. 3, 2025), the merits of *D.V.D.* are still pending.

7.      To preserve the status quo, at least while *D.V.D.* is pending, Plaintiffs seek relief from their imminent removal to South Sudan as impermissibly punitive. Defendants' abuse of the removal process and disregard of basic legal tenants to banish Plaintiffs to South Sudan is

---

[1]  U.S. Department of State, *South Sudan Travel Advisory* (Mar. 8, 2025), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/south-sudan-travel-advisory.html.

unprecedented and may not be executed without attendant constitutional procedures.

8.      At the very least, Plaintiffs seek a stay of removal and to remain in custody of Defendants until they receive a meaningful opportunity to contest their banishment to South Sudan.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq.* (habeas corpus), U.S. Const. art. I, § 9, cl. 2 (Suspension Clause), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), and 28 U.S.C. § 1651 (All Writs Act). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

10.     The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; 28 U.S.C. § 1331; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of agencies of the United States, Defendants reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff Enrique Arias-Hierro ("E.A.H.") is a native of Cuba. He has a final order of removal, with Cuba as the country designated for removal. South Sudan was never designated. E.A.H. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. E.A.H. was convicted of certain crimes in the United States and served his sentence. E.A.H. fears persecution and torture if deported to South Sudan.

13.     Plaintiff Jose Manuel Rodriguez-Quinones ("J.M.R.") is a native of Cuba. He has

a final order of removal, with Cuba as the country designated for removal. South Sudan was never designated. J.M.R. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. J.M.R. was convicted of certain crimes in the United States and served his sentence. J.M.R. fears persecution and torture if deported to South Sudan.

14.     Plaintiff Kyaw Mya ("K.M.") is a native of Burma. He has a final order of removal, with Burma as the country designated for removal. South Sudan was never designated. K.M. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. K.M. was convicted of certain crimes in the United States and served his sentence. K.M. fears persecution and torture if deported to South Sudan.

15.     Plaintiff Thongxay Nilakout ("T.N.") is a native of Laos. He has a final order of removal, with Laos as the country designated for removal. South Sudan was never designated. T.N. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. T.N. was convicted of certain crimes in the United States and served his sentence. T.N. fears persecution and torture if deported to South Sudan.

16.     Plaintiff Tuan Thanh Phan ("T.T.P.") is a native of Vietnam. He has a final order of removal, with Vietnam as the country designated for removal. South Sudan was never designated. T.T.P. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. T.T.P. was convicted of certain crimes in the United States and served his sentence. T.T.P. fears persecution and torture if deported to South Sudan.

17.     Plaintiff Jesus Munoz-Gutierrez ("J.M.G.") is a native of Mexico. He has a final order of removal, with Mexico as the country designated for removal. South Sudan was never designated. J.M.G. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. J.M.G. was convicted of certain crimes in the United States and served his sentence. J.M.G. fears persecution and torture if deported to South Sudan.

18.     Plaintiff Dian Peter Domach ("D.D.") is a native of Sudan. He has a final order of removal, with Sudan. as the country designated for removal. South Sudan was never designated. T.N. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. T.N. was convicted of certain crimes in the United States and served his sentence. D.D. fears persecution and torture if deported to South Sudan.

19.     Plaintiff Nyo Myint ("N.M.") is a native of Burma. He has a final order of removal, with Burma as the country designated for removal. South Sudan was never designated. N.M. is detained in the control and custody of Defendants at a U.S. naval base in Djibouti. N.M. was convicted of certain crimes in the United States and served his sentence. N.M. fears persecution and torture if deported to South Sudan.

**B.      Defendants**

20.     Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). In this capacity, Defendant Noem is the legal custodian of Plaintiffs and the members of the putative class. Defendant Noem is sued in her official capacity.

21.     Defendant DHS is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing lawful immigration to the United States. Defendant DHS is a legal custodian of Plaintiffs.

22.     Defendant Todd Lyons is Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement ("ICE"). Defendant Lyons is responsible for ICE's policies, practices, and procedures, including those relating to removal procedures and the detention of immigrants during their removal procedures. Defendant Lyons is a legal custodian of Plaintiffs. Defendant Lyons is sued in his official capacity.

23.     Defendant ICE is a federal law enforcement agency within DHS. Defendant ICE is responsible for the enforcement of immigration laws, including the detention and removal of

immigrants. Defendant ICE is a legal custodian of Plaintiffs.

24.    Defendant Pete Hegseth is the United States Secretary of Defense. In this capacity, Defendant Hegseth maintains custody and control over Plaintiffs. Defendant Hegseth is sued in his official capacity.

25.    Defendant U.S. Department of Defense ("DOD") is a federal agency responsible for the Naval Station at Camp Lemonnier in Djibouti. Defendant DOD is a legal custodian of Plaintiffs.

26.    Defendant Marco Rubio is the United States Secretary of State. In this capacity, Defendant Rubio maintains custody and control over Plaintiffs.

27.    Defendant U.S. Department of State is a federal agency responsible for working with foreign states to execute removal operations, including working with South Sudan in relation to Plaintiffs' removal to South Sudan. Defendant U.S. Department of state is a legal custodian of Plaintiffs.

## STATEMENT OF FACTS

### I.    Legal and Factual Background

#### A.    Defendants' Punitive Third-Country Removal Scheme

28.    Defendants' practice of removing individuals to third countries where they may face persecution or torture, in defiance of the procedures spelled out in the immigration laws and mandated by common-sense due process and international law, is plainly punishment.

29.    It is bedrock law that the government may not remove noncitizens where they face persecution or torture. These withholding of removal and CAT protections are *mandatory*—i.e., not subject to discretion—and country specific.

30.    The immigration laws delineate the proper procedures by which a country may be designated for removal. *See* 8 U.S.C. § 1231(b). Removal to third countries is permissible only

after the Government tries each and every alternative noted in the statute, and determines they are all "impracticable, inadvisable, or impossible." 8 U.S.C. §§1231(b)(1)(C)(iv), (2)(E)(vii). The laws explicitly prohibit removal to a third country where a person may be persecuted or tortured. *See* 8 U.S.C. § 1231(b)(3)(A).

31.    These procedures are not demanding. Providing basic due process protections before noncitizens are removed to third countries where they may fear persecution or death is mandated U.S. and international law. Courts have unanimously held the same.[2]

32.    Indeed, as the district court in *D.V.D.* rhetorically queried: "[B]efore the United States forcibly sends someone to a country other than their country of origin, must that person be told where they are going and be given a chance to tell the United States that they might be killed if sent there?" ECF No. 64 at 1. While Defendants say no, "[a]ll nine sitting justices of the Supreme Court of the United States, the Assistant Solicitor General of the United States, Congress, common sense, basic decency, and this Court all disagree." *Id. at* 1-.2

33.    These basic protections have nonetheless been upended through Defendants' scheme to punish noncitizens by deliberately removing them to violent, war-torn countries where they will be imprisoned or subjected to physical harm. There is no logical, non-punitive explanation for this practice. "[D]evices of banishment and exile have throughout history been used as punishment." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 at 170, n.23.

34.    Defendants devised the third-country removal scheme even before the Trump administration took office.

35.    The practice is now notorious in its breadth and its cruelty—from removing

---

[2] *See Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir. 1999); *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998); *El Himri v. Ashcroft*, 378 F.3d 932, 938 (9th Cir. 2004); *cf. Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir. 2005) (per curiam) (permitting designation of third country where individuals received "ample notice and an opportunity to be heard").

Venezuelans to indefinite detention in a supermax prison in El Salvador, where reporting shows deportees were beaten with batons, forced to kneel for nine hours upon arrival, and various other forms of physical and psychological torture, while held incommunicado to the outside world; to detaining noncitizens in Guantánamo Bay; to, here, attempting to remove Plaintiffs to one of the most dangerous, war-torn countries in the world.

36.     The government is in fact negotiating with *dozens* of third countries to pressure those countries to accept removed noncitizens. These include countries as far away from the United States as possible and countries that are demonstrably unsafe, like South Sudan.

37.     The cruelty is the point. Indeed, Defendants openly broadcast that their third-country removal scheme is motivated by an intent to punish Plaintiffs and deter future migration—the traditional aims of punishment. *Kansas v. Hendricks*, 521 U.S. 346, 373 (1997) (Kennedy, J., concurring) ("We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.").

38.     For example, Secretary of State Marco Rubio stated at a cabinet meeting about the third-country removal process: "We are working with other countries to say, 'We want to send you some of the most despicable human beings to your countries, and will you do that as a favor to us?' And the farther away from America the better, so they can't come back across the border."[3] Reporting further reflects that spokesperson for the U.S. Department of Homeland Security, Tricia McLaughlin, added: "If you enter unlawfully, you will be removed—and in a way that makes it far more difficult to try again."[4]

---

[3] Edward Wong, et al., *Inside the Global Deal-Making Behind Trump's Mass Deportations*, N.Y. Times (Jun. 25, 2025), https://www.nytimes.com/2025/06/25/us/politics/trump-immigrants-deportations.html ("Wong, et al.").

[4] Wong, et al.

39.    Secretary Rubio's and Ms. McLaughlin's punitive motivations have been widely shared and celebrated by the administration.

40.    On May 9, 2025, President Trump explicitly threatened arbitrary removals of noncitizens as punishment: "Illegal aliens who stay in America face *punishments*, including— sudden deportation, in a place and manner solely of our discretion."[5]

41.    White House Deputy Chief of Staff Stephen Miller, Trump's advisor on immigration, also threatened that a noncitizen with a removal order "could be indefinitely detained and removed to any other country in the world" and "sent to literally any country on the face of the earth."[6]

42.    The State Department openly admitted that "ongoing engagement with foreign governments" was "vital to deterring illegal and mass migration and securing our borders."[7]

43.    And Secretary Kristen Noem for the U.S. Department of Homeland Security warned noncitizens and potential migrants in an international, multi-million-dollar ad: "President Trump has a clear message: if you are here illegally, we will find you and deport you . . . If you are a criminal alien considering entering America illegally: Don't even think about it.  If you come here and break our laws, we will hunt you down."[8]

44.    Defendants' intent is loud and clear: they wish to punish Plaintiffs with banishment to a third country where they may be indefinitely imprisoned or harmed, and to deter migration or

---

[5] https://x.com/realDonaldTrump/status/1921008311492624867 (emphasis added).

[6] *Breaking News: Stephen Miller Defends Trump Admin. Deporting Maryland Man to El Salvador Prison*, Forbes Breaking News (Apr. 14, 2025), https://www.youtube.com/watch?v=C-BhC0QHDfY.

[7] Kate Bartlett, *Rwanda says it's in 'early stages' of talks with U.S. to take in deported migrants*, NPR (May 6, 2025), https://www.npr.org/2025/05/05/nx-s1-5387506/rwanda-talks-us-deportation-migrants.

[8] Press Release, *DHS Announces Nationwide and International Ad Campaign Warning Illegal Aliens to Self-Deport and Stay Out*, Department of Homeland Security (Feb. 17, 2025), https://www.dhs.gov/news/2025/02/17/dhs-announces-ad-campaign-warning-illegal-aliens-self-deport-and-stay-out.

encourage self-deportation for others with the threat of the same.

45.    Defendants' actions violate basic tenets of constitutional and immigration law, which mandate that removal and detention to that process cannot be imposed with conditions akin to criminal punishment. *Wong Wing v. U.S.*, 163 U.S. 228, 237 (1896).

**B.    *D.V.D. v. DHS***

46.    On March 23, 2025, Plaintiffs, as putative class members, sought to challenge and stay Defendants' third-country removal scheme. *See D.V.D.*, ECF No. 1.

47.    On April 18, 2025, the district court granted injunctive relief, emphasizing that U.S. and international law, due process, prior governmental statements, and common sense all militated in favor of providing due process before removing noncitizens to third countries where they may be harmed. *D.V.D.*, ECF No. 64.

48.    It enjoined all removals to third countries (*i.e.*, removal to a country *other* than a country designated on the noncitizen's order of removal), unless the noncitizen and their counsel received 1) notice in a language the noncitizen understands and 2) a meaningful opportunity, and a minimum of ten days, to raise a fear-based claim for CAT protection prior to removal. *Id.*

49.    Plaintiffs were covered by the injunction.

50.    Nonetheless, on May 20, 2025, Plaintiffs received at most 16 hours' notice before they were placed on a removal flight bound for South Sudan.

51.    After convening an emergency hearing in response to the class's motion to enforce the injunction, the district court ordered the government to "maintain custody and control" of the individuals "to ensure the practical feasibility of return if the Court finds that such removals were unlawful." *D.V.D.*, ECF No. 116 at 1.

52.    Prohibited from removing Plaintiffs to South Sudan, the flight landed at the U.S. naval base in Djibouti on May 21, 2025, where Plaintiffs have since remained in a converted

shipping container.

53.     The district court found that Defendants' actions "unquestionably" violated the injunction. *See D.V.D.*, ECF No. 118 (identifying "facts regarding the unavailability of information, the hurried and confused notice that the individuals received, language barriers, and attorney access compound and confirm this Court's finding that no reasonable interpretation of the Court's Preliminary Injunction could endorse [these] events."); *see also, e.g.*, *DHS v. D.V.D.*, No. 24A1153 at 10 (S. Ct. Jun. 23, 2025) (Sotomayor, J., dissenting) ("Notice at 5:45 p.m. for a 9:35 a.m. deportation, provided to a detainee without access to an attorney, plainly does not 'affor[d]' that noncitizen with 'a reasonable time' to seek relief.") (quoting *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 4)).

54.     The district court thus granted a remedial order directing the Government to follow specified procedures with respect to Plaintiffs. *D.V.D.*, ECF No. 119; *D.V.D.*, ECF No. 176.[9]

55.     On May 27, 2025, Defendants sought a stay of the preliminary injunction from the U.S. Supreme Court, and, on June 23, 2025, the Court granted the stay. *DHS v. D.V.D.*, No. 24A1153 (S. Ct. Jun. 23, 2025). The Supreme Court did not address the merits of Plaintiffs' claims, including whether the eight Plaintiffs were entitled to notice and an opportunity to seek protection before removal to a third country. *Id.*

56.     On July 3, 2025, the Supreme Court clarified that the district court's remedial order concerning Plaintiffs also was covered by its earlier stay ruling. As such, Plaintiffs have no protection from removal through the *D.V.D.* litigation while it is pending on the merits.

---

[9] The Court's order at ECF No. 176 clarified that Plaintiffs N.M. and D.D. are included in the Order on Remedy, ECF No. 119, along with the six other Plaintiffs.

**C.    Plaintiffs Are Likely To Be Persecuted, Tortured, Or Killed If Removed To South Sudan.**

57.    Plaintiffs are at risk of imminent removal to South Sudan. Minutes after the Supreme Court's July 3, 2025, ruling, a spokesperson for the Department of Homeland Security, stated that the men "will be in South Sudan by Independence Day."[10]

58.    South Sudan is one of the most dangerous countries in the world, one that has recently returned to full-blown and catastrophic civil war.[11] Conditions in South Sudan have long been poor and dangerous even for the South Sudanese: the country is the source of one of the "most significant" refugee crises on the African continent, with 2.3 million of its own nationals currently refugees or asylum seekers in neighboring countries and an additional two million internally displaced.[12]

59.    In "reaffirm[ing] its call on States to refrain from forcibly returning South Sudanese nationals or habitual residents of South Sudan to any part of the country," the United Nations Mission in South Sudan has documented numerous human rights violations including "the killing, injuring and abducting of civilians, conflict-related sexual violence, arbitrary arrests and detention, extrajudicial executions and restrictions to fundamental freedoms," as well as "crisis or worse levels of hunger" for two thirds of the country's population.[13]

---

[10] Lawrence Hurley, Supreme Court paves the way for Trump to send migrants to South Sudan, NBC News (Jul. 3, 2025), https://www.nbcnews.com/politics/supreme-court/supreme-court-trump-send-migrants-south-sudan-djibouti-rcna214952.

[11] Florence Miettaux, '*They Came for Us, to Take our Shelters and Kill Us:' How Violence Returned to a Shattered South Sudan*," The Guardian (May 16, 2025) https://www.theguardian.com/global-development/2025/may/16/violence-south-sudan-politicians-arrested-bombings    The    Guardian (quoting the U.N. Mission in South Sudan (UNMISS), which stated that they were "left with no other conclusion but to assess that South Sudan is teetering on the edge of a relapse into civil war").

[12] United Nations High Commissioner for Refugees (UNHCR), South Sudan: Global Appeal 2025 Situation    Overview    (Nov.    2024), https://web.archive.org/web/20250522134934/https://reporting.unhcr.org/sites/default/files/2024-11/South%20Sudan%20Situation%20Overview.pdf.

[13] UNHCR, *Position on Returns to South Sudan—Update IV* at 7, 11, 15 (May 2024),

60.    Armed actors, including government forces "have beheaded civilians and burned homes while men, women, and children remained inside."[14] South Sudan's National Security Service ("NSS"), the country's intelligence agency, effectively operates outside the law, maintaining its own detention facilities separate from the National Prison Service where "detainees are subjected to torture and ill-treatment and kept in poor conditions."[15]

61.    The U.S. Department of State's most recent human rights report for South Sudan similarly found "[s]ignificant human rights issues inclu[ding] credible reports of . . . torture or cruel, inhuman or degrading treatment or punishment by [South Sudan's] security forces[.]"[16]

62.    Since March, in response to armed attacks by non-governmental forces, the South Sudanese government has intensified its aerial bombardment of Upper Nile State using improvised incendiary weapons that have killed and horribly burned civilians, including children, and destroyed civilian infrastructure.[17]

63.    The 2018 peace agreement that was supposed to have ended South Sudan's five-year civil war "has now totally collapsed."[18]

64.    One month before Plaintiffs' attempted removal there, the U.S. State Department issued stark travel warnings regarding South Sudan, advising its citizens not to travel there because of "crime, kidnapping, and armed conflict."[19] It further warned Americans that, before travel, they

---

https://www.refworld.org/policy/countrypos/unhcr/2024/en/147589

[14] *Id.* at 8.

[15] *Id.*

[16] South Sudan 2023 Human Rights Report, U.S. Department of State, https://www.state.gov/wp-content/uploads/2024/02/528267-SOUTH-SUDAN-2023-HUMAN-RIGHTS-REPORT.pdf.

[17] Human Rights Watch, *South Sudan: Incendiary Bombs Burn, Kill Civilians* (Apr. 9, 2025), https://www.hrw.org/news/2025/04/09/south-sudan-incendiary-bombs-kill-burn-civilians.

[18] Augustine Passilly and Mamar Abraham, *Army Barrel Bombs Spark Exodus as South Sudan Peace Deal Crumbles,* The New Humanitarian (May 20, 2025), https://www.thenewhumanitarian.org/news-feature/2025/05/20/army-barrel-bombs-spark-exodus-south-sudan-peace-deal-crumbles.

[19] *Supra* n.1 (emphases in original).

should create a will, coordinate funeral arrangements, and identify a hostage negotiator.

65.    The U.S. Department of State further warned that "[v]iolent crime, such as carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout South Sudan, including [its capital,] Juba."

66.    The State Department further warned that foreign nationals in South Sudan have been the victims of rape, sexual assault, armed robberies, and other violent crimes."[20]

67.    An expert on the treatment of foreign nationals in Sudan has explained that "it is extremely likely" that the Plaintiffs will be detained immediately upon or soon after arrival in South Sudan by NSS, at which point it is likely they will face conditions amounting to torture.[21] These conditions could include "[b]eatings, whippings, being hung upside down, electrocution, burning, exposure to the elements, piercing with needles, rape, sexual violence and humiliation," as well as denial of access to legal counsel, indefinite detention, and purposeful withholding of food, water, and/or medical care.[22]

68.    The NSS, which runs the facilities where Plaintiffs are likely to be held, operates "with near total impunity," and is regularly and credibly linked to "to torture, kidnapping, disappearances and extrajudicial killings," including "mobile killing squads" known to target foreign nationals.[23] Even in the unlikely event that the Plaintiffs were not taken into custody, they would likely face, at a minimum, inability to find housing or lawful work, which itself is likely to result in police and/or gang harassment, arrest, and subsequent abuse in detention.[24]

---

[20] *Id.*

[21] S*ee D.V.D.*, ECF No. 152-2 (Declaration of Leonie Newhouse) ¶ 19.

[22] *Id.* ¶ 21; *see also id.* ¶ 22 (noting that "[d]eaths in custody are common, with bodies showing marks of beatings and torture disposed of in rivers, ditches and roadsides").

[23] *Id.* ¶¶ 24-26.

[24] *Id.* ¶¶ 27-35.

69.     There is also risk that Plaintiffs could be further removed from South Sudan to other countries where they may face harm, in violation of chain *refoulement*.

70.     As the district court in *D.V.D.* already found, the "risk of irreparable harm . . . be[came] tangible" for Plaintiffs "when they were nearly dropped off in a war-torn country where the Government states that '[f]oreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes.'"[25]

### D.     Plaintiffs' Punitive and Unlawful Detention and Removal

71.     Plaintiffs, originating from Cuba, Laos, Mexico, Myanmar, Sudan, and Vietnam, were ordered removed pursuant to immigration removal proceedings.

72.     None of Plaintiffs were ordered removed to South Sudan. To the contrary, they were issued final removal orders designating countries other than South Sudan as countries of removal. *See D.V.D.*, Dkt. 129-1; Exhibit A (Hughes Declaration) ¶ 4.

73.     Plaintiffs uniformly fear for their lives if removed to South Sudan.

74.     Defendants have exacerbated Plaintiffs' risk of persecution or torture based on their status as deportees by publicly releasing their names, criminal histories, and photographs, which have sense been widely broadcasted.

75.     Defendants have also maligned Plaintiffs. In a social media post, President Trump described Plaintiffs as "eight of the most violent criminals on Earth."[26] Assistant DHS Secretary Tricia McLaughlin described Plaintiffs as "uniquely barbaric monsters."[27]

76.     None of the Plaintiffs, except possibly Petitioner Dian, speak Arabic or have even

---

[25] Mem. & Order on Defs.' Mots. for Recons. & Stay, *D.V.D.*, ECF No. 135 at 16.

[26] https://truthsocial.com/@realDonaldTrump/posts/114552682280589564 (May 22, 2025).

[27] Press Release, *DHS Sets the Record Straight on Media Frenzy over Deportation Flights for Worst of the Worst Including Murderers, Rapists, and Pedophiles*, U.S. Department of Homeland Security (May 21, 2025), https://www.dhs.gov/news/2025/05/21/dhs-sets-record-straight-media-frenzy-over-deportation-flights-worst-worst.

minimal ties or possibility of a livelihood in South Sudan, where they will be effectively disappeared.

77.     By information and belief, Defendants did not even *attempt* to remove Plaintiffs to their designated countries of removal in their removal orders, or other countries delineated in the statute, *see* 8 U.S.C. § 1231(b), before attempting to banish them in South Sudan.

78.     While Defendants claim that the designated countries refused Plaintiffs' removal, evidence in the public domain reflects that these countries accept deportees.

79.     For example, Mexico routinely accepts its own citizens deported from the U.S. Since the beginning of Trump's administration Mexico has received nearly 39,000 immigrants deported from the U.S., of which 33,000 are Mexicans.[28]

80.     In 2018, Laos agreed to accept a limited number of citizens deported from the U.S.[29] In March 2025, the Lao Embassy in the United States, with the Ministry of Foreign Affairs of Laos, issued an official notice urging Lao citizens who are illegally residing in the U.S. to voluntarily return to Laos, citing potential risks of arrest and deportation.[30]

81.     Myanmar accepted two Myanmar nationals deported by the U.S. in March 2025,[31]

---

[28] *Mexico has received nearly 39,000 deportees from US since Trump took office,* Reuters (Apr. 29, 2025), https://www.reuters.com/world/americas/mexico-has-received-nearly-39000-deportees-us-since-trump-took-office-2025-04-29/.

[29] *Resources for Southeast Asian Refugees Facing Deportation*, Asian Law Caucus (Jun. 12, 2025), https://www.asianlawcaucus.org/news-resources/guides-reports/resources-southeast-asian-refugees-facing-deportation#:~:text=Laos:%20Laos%20does%20not%20have,and%20other%20ethnic%20minority%20communities.

[30] Beatrice Siviero, *Laos Issues Voluntary Return Notice for Nationals Residing in the US Without Legal Documents Amid Deportation Threats*, The Laotian Times (Mar. 26, 2025), https://laotiantimes.com/2025/03/26/laos-issues-voluntary-return-notice-for-nationals-in-the-us-amid-deportation-threats/.

[31] *Myanmar to receive two citizens deported by the United States*, Eleven Myanmar (Mar. 22, 2025), https://elevenmyanmar.com/news/myanmar-to-receive-two-citizens-deported-by-the-united-states.

and Cuba has accepted five deportation flights carrying its citizens since Trump took office.[32]

82.    In 2020, Vietnam signed an agreement with the U.S. that made it easier for Vietnam to accept those who arrived in the U.S. before 1995. Petitioner Phan, who arrived in the U.S. in 1991, would be eligible under this agreement, and had already made plans to return to Vietnam before he was abruptly put on a plane bound for South Sudan.[33]

83.    Nor do Plaintiffs or their immigration or class counsel have information that Defendants attempted to effectuate Plaintiffs' removal to their designated countries.

84.    In fact, on May 19, 2025, when Phan's wife inquired with the ICE deportation officer in charge of Phan's case, the officer told her that he had not yet submitted paperwork to Vietnam for Phan's removal there. Phan's wife has since attempted to reach the Vietnamese government through various channels. On June 23, 2025, the Vietnamese consulate in New York told Phan's wife: "we are not aware of whether Mr. Phan's repatriation is currently under review by DHS/ICE in coordination with the Vietnamese authorities under existing bilateral agreements." Phan's counsel has also sent Defendants' counsel the contact information of a person willing to sponsor Phan in Vietnam but have not received any response that indicates Defendants has communicated with Vietnamese authorities to remove Phan to Vietnam.

    **E.    Defendants' Failure to Provide Mandated Due Process Protections**

85.    Despite requesting that Plaintiffs remain at Camp Lemonnier to receive the protections ordered by the district court in *D.V.D.*, Defendants have failed to provide Plaintiffs with the proper procedures.

---

[32] Eric Bazail-Eimil, *Cuba tried to improve its relations with the US by cooperating with Trump's deportation flights. It didn't work*, Politico (Jun. 2, 2025), https://www.politico.com/news/2025/06/02/cuba-us-relations-deportation-flights-johana-tablada-00381355.

[33] Ximena Bustillo, *The White House is deporting people to countries they're not from. Why?*, NPR (Jun. 1, 2025), https://www.npr.org/2025/06/01/g-s1-69780/trump-deportations-south-sudan.

86.     Defendants failed to provide Plaintiffs with any means to access their lawyers until after two weeks following their arrival in Djibouti.

87.     Despite repeated outreach by Plaintiffs' immigration counsel starting the day after the arrival, Defendants only reported that they had provided Plaintiffs with contact information for their attorneys weeks later. *See D.V.D.*, ECF Nos.153, 172, and 175.

88.     To date, three of the Plaintiffs received reasonable fear interviews ("RFIs") but not determinations on those RFIs; three Plaintiffs had RFI interviews that were scheduled but then cancelled; and N.M. and D.D. are still awaiting any information about their RFIs.

89.     Despite the district court's repeated mandate to provide notice and an opportunity to respond, Defendants have failed to provide these procedures, while Plaintiffs languish in deplorable conditions at Camp Lemonnier.

90.     Plaintiffs are held in a converted shipping container, where they are shackled by the feet except to use the shower every other day, apparently subject to combat-like procedures.[34]

91.     According to a declaration by a senior ICE official, Plaintiffs currently face daily outdoor temperatures of over 100 degrees Fahrenheit, smoke from nearby burn pits, lack of quality air, and the "imminent danger of rocket attacks from terrorist groups in Yemen," without body armor or other protective gear. *See D.V.D.*, ECF No. 151 (Decl. of Mellissa B. Harper).

92.     Both Plaintiffs and ICE officers began to feel ill within 72 hours of landing in Djibouti, and the flight nurse was only able to obtain some of the medical supplies necessary for proper care and safety. *Id.* ¶ 14. It is unknown how long medical supplies will last. *Id.* ¶¶ 11, 14.

93.     As the ICE official admits, this housing "is not equipped nor suitable for detention

---

[34] Mattathias Schwartz et al, *Homeland Security is Holding Eight Deportees Under 24/7 Guard at a U.S. Military Base in Djibouti. It's Unclear How Long They'll be There, or Where They'll be Sent Next*, The New York Times (June 6, 2025), https://www.nytimes.com/2025/06/06/us/trump-dhs-djibouti-deportees.html.

of any length." *Id.* ¶ 8.

   F.    **Diplomatic Assurances**

94.    On June 24, 2025, Defendants stated for the first time, in their reply brief in connection with a motion before the Supreme Court in *D.V.D.*, that they received "diplomatic assurances" that Plaintiffs would not be subject to torture in South Sudan.

95.    Diplomatic assurances refer to Defendants' March 30, 2025, policy memorandum ("the March memo") providing that the government, before returning noncitizens to third countries not designated on their removal order, "must determine whether that country has provided diplomatic assurances that [noncitizens] removed from the United States will not be persecuted or tortured."[35]

96.    The March memo not require advance written notice or other protections required by law. It proposes a woefully inadequate screening procedure that fails to inform Plaintiffs of their rights or require Defendant to ask about their fear; applies an impermissible, heightened fear standard; and curtails administrative and judicial review.

97.    Defendants have also provided no evidence whatsoever of South Sudan's diplomatic assurances, let alone evidence sufficient to support the reliability of the assurances. *See Khouzam v. Att'y Gen.*, 549 F.3d 235, 257 (3d Cir. 2008) ("In fact, beyond the Government's bare assertions, we find no record supporting the reliability of the diplomatic assurances that purportedly justified the termination of [the noncitizen's] deferral of removal.").

98.    Neither Plaintiffs nor their immigration counsel or class counsel in *D.V.D.* have received any individualized diplomatic assurances, let alone an opportunity to review or rebut those assurances. Defendants thus violated the statutory and regulatory requirements that any such

---

[35] *D.V.D.*, ECF No. 43-1 (Exhibit A).

assurances must be individualized. *See* 8 C.F.R. § 1208.18(c)(1) ("The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that *an* alien would not be tortured there if *the* alien were removed to that country." (emphases added)).

99.     Defendants' statement also fails to demonstrate that one of three designated officials—the Attorney General, Deputy Attorney General, or the DHS Immigration and Customs Enforcement (ICE) Assistant Secretary—independently "determine[d], in consultation with the Secretary of State, whether the assurances are sufficiently reliable" to allow removal consistent with the Convention Against Torture. 8 C.F.R. § 1208.18(c)(2).

100.    Nor do the diplomatic assurances even meet the minimum threshold requirements spelled out in the March memo. There is no evidence, for example, that Defendants received assurances prior to the Plaintiffs' removal to a non-designated country, or that the assurances address both the possibility of torture *and persecution.*

### CLAIMS FOR RELIEF
### COUNT I
### Violation of Fifth, Sixth and Eight Amendments: Punitive Banishment

101.    Under the Fifth Amendment of the U.S. Constitution, no person shall "be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury;" "be subject for the same offence to be twice put in jeopardy of life or limb;" "nor be deprived of life, liberty, or property, without due process of law."

102.    The Sixth Amendment of the U.S. Constitution provides that the criminally accused "shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . and to be informed of the nature and cause of the accusation," among other procedural protections.

103.    The Eighth Amendment provides that no "cruel and unusual punishments" may be

inflicted.

104.    The U.S. Supreme Court long ago held that the government may not inflict upon individuals an "infamous punishment" in addition to deportation, as a penalty for an immigration violation, absent criminal charges, a judicial trial, and attendant constitutional protections. *Wong Wing v. U.S.*, 163 U.S. 228 (1896).

105.    Petitioners were all convicted and sentenced for their criminal convictions. They completed the sentences imposed by a court of law. Their convictions made them removable from the United States, but their convictions do not authorize the government to inflict, as a matter of executive policy and discretion, additional punishment on Petitioners.

106.    The government seeks to inflict a second, severe punishment on Petitioners for their criminal convictions by removing them to South Sudan, where they know and intend that they may be arbitrarily imprisoned, tortured, killed, or severely harmed.

107.    The harm the government seeks to inflict on Petitioners is an "infamous punishment" that may not be imposed under the protections of the Constitution. *See Wong Wing v. U.S.*, 163 U.S. 228, 237-38 (1896).

108.    Petitioners' removal to South Sudan constitutes unlawful punishment, in violation of the Fifth, Sixth and Eighth Amendments to the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

   a.    Assume jurisdiction over this action;

   b.    Declare that Defendants' efforts to remove Plaintiffs to South Sudan is punitive;

   c.    Preliminarily and permanently enjoin Defendants from removing Plaintiffs to South Sudan;

   d.    Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28

U.S.C. § 2412; and

e.      Order all other relief that the Court deems just and proper.


Dated: July 3, 2025                              Respectfully submitted,

                                                */s/ Mary S. Van Houten Harper*
                                                Mary S. Van Houten Harper (D.C. Bar No.
                                                1045137)
                                                Hausfeld LLP
                                                1200 17th St NW Suite 600
                                                Washington, DC 20036
                                                mvanhouten@hausfeld.com

                                                Joanne Bui* (CA Bar No. 340378)
                                                Hausfeld LLP
                                                580 California St 12th Floor
                                                San Francisco, CA 94104
                                                jbui@hausfeld.com

                                                Jennie Pasquarella* (CA Bar No. 263241)
                                                Seattle Clemency Project
                                                20415 72nd Ave South, Suite 1-415
                                                Kent, WA 98032
                                                jennie@seattleclemencyproject.org


                                                *Attorneys for Petitioners-Plaintiffs*
                                                *\* pro hac vice pending*